FILED
SUPERIOR COURT
OF GUAM

2014 SEP 29 PM 3: 41

CLERK OF COURT

BY:

## IN THE SUPERIOR COURT OF GUAM

| | |
|---|---|
| MARIA DIANA BAUTISTA and LILIA S.B. APALE pka LILIA S. BAUTISTA, <br><br> Plaintiffs, <br><br> v. <br><br> GUAM MEMORIAL HOSPITAL AUTHORITY, <br><br> Defendant. | CASE NO. CV1058-11 <br><br> **FINDINGS OF FACT & CONCLUSIONS OF LAW** |

## INTRODUCTION

This matter came before the Honorable Vernon P. Perez on March 12 and 13, 2014 for a bench trial on the issue of liability. Plaintiff Maria Diana Bautista ("Plaintiff Bautista") was represented by William L. Gavras, Esq., and Plaintiff Lilia S.B. Apale pka Lilia S. Bautista ("Plaintiff Apale") was represented by Jeffrey A. Cook, Esq. Neither plaintiff was present at the bench trial. Defendant Guam Memorial Hospital Authority ("GMHA") was represented by Minakshi V. Hemlani, Esq. Having considered the evidence presented, the Court hereby makes the following findings of fact and conclusions of law[1].

---

[1] At the conclusion of the bench trial on March 13, 2014, the Court invited the parties to submit proposed findings of fact and conclusions of law by April 10, 2014, but also indicated that it would consider filings if it did not yet issue its own findings of fact and conclusions of law. Defendant GMHA requested an extension of that deadline to April 14, 2014, which the Court granted. Plaintiff Apale and Defendant GMHA submitted its proposed findings on April 14, 2014, while Plaintiff Bautista filed its proposed findings on April 22, 2014. On April 23, 2014, Defendant moved to strike Plaintiff Bautista's proposed findings as it was not aware that another extension of the deadline was sought or granted. The Court acknowledges that its instructions at the conclusion of trial indicated

## FINDINGS OF FACT

By a preponderance of the evidence, the Court makes the following findings of fact:

1. Plaintiff Bautista is the adult daughter of Decedent Danilo Bautista ("Mr. Bautista").

2. Plaintiff Apale is the widow of Mr. Bautista.

3. Defendant GMHA is an autonomous agency of the Government of Guam and may be sued in its own name. 5 GCA § 6102. At all relevant times herein, Defendant operated a hospital known as the Guam Memorial Hospital ("GMH") located in Tamuning, Guam.

4. On May 7, 2008, Mr. Bautista was admitted to the GMH emergency department for treatment of a self-inflicted laceration to his neck, the result of an attempted suicide.

5. Dr. Eduardo Cruz, who was the attending physician, noted on the history and physical examination form: "48 [year old] male second attempted suicide, [positive] hanging on 2/24/2008 [and] now sustains self-inflicted knife laceration [positive] paranoia [positive] hallucinations." (Pl.'s Ex. 1 at 00014).

6. Dr. Cruz, also noted that Mr. Bautista was "quiet, verbalize and responding appropriately, appeared depressed." *Id.*

7. After initially seeing Dr. Cruz, Mr. Bautista was then seen by Dr. Brian Bates.

8. On May 7, 2008, Mr. Bautista underwent surgery, which involved "repair of tracheal injury with repair of complex laceration to neck." *Id.* at 00013.

9. Mr. Bautista remained intubated postoperative "because of anticipated edema of the trachea at the repair site." *Id.*

10. Dr. Bates ordered that soft restraints be utilized for patient safety. *Id.* at 00020.

11. On May 8, 2007, Dr. Bates noted that Mr. Bautista "may transfer to regular floor near nursing station." *Id.* at 00022.

12. Mr. Bautista was placed on the fourth floor in a single room near the nurses' station to accommodate the size of the ventilator machine and the noises emanating from it.

that it would consider filings up until it issues its own findings. As a result, the Court will deny Defendant's Motion to Strike. Accordingly, the Court will consider Plaintiff Bautista's submission.

*Bautista v. GMHA*
Civil Case No. CV1058-11
Findings of Fact & Conclusions of Law

(Testimony of Nurse Josie Paunte ("Nurse Paunte"), Digital Recording at 11:08:29-11:08:46, Mar. 12, 2014).

13. On the morning of May 8, 2008, Nurse Paunte prepared a care plan for Mr. Bautista. The care plan included a section entitled: "Psych - Major Depression - Risk for Suicide." (Pl.'s Ex. 1, at 00028).

14. The care plan called for the completion of an initial suicide assessment and, further, that "[i]f patient is hospitalized, monitor for moderate risk every 15 minutes: or provide constant one-on-one observation for serious risk. Place in room close to nurse's station. Do not assign to single room." *Id.*

15. Nurse Paunte categorized Mr. Bautista as a level three suicide risk—the highest risk level—based on Mr. Bautista's history, which indicated major depression, feelings of worthlessness, hallucinations, Mr. Bautista's cutting of his throat, and paranoia. (Testimony of Nurse Paunte, Digital Recording at 10:55:14-10:55:42, Mar. 12, 2014).

16. Also on May 8, 2008, Nurse J.M. Apalo ("Nurse Apalo") assessed Mr. Bautista's potential for self-harm. She noted that there was a potentially lethal suicide attempt in the past seventy-two hours; that there was current suicide ideation; that Mr. Bautista previously considered a plan for self-harm; that Mr. Bautista was experiencing auditory hallucinations that command self-harm; that Mr. Bautista had minimal ability or commitment to not harm himself; and that there were manifestations of depression indicating feelings of hopelessness and/or helplessness. (Pl.'s Ex. 1, at 00037-38).

17. Nurse Paunte also worked the night shift on May 8, 2011 from 11:00 p.m. to 7:30 a.m. on May 9, 2011.

18. Nurse Paunte testified that bilateral wrists restraints were used on Mr. Bautista's hands primarily so that he could not remove the tube in his throat. She further testified that the restraints were also used for safety reasons. (Testimony of Nurse Paunte, Digital Recording at 11:19:10-11:20:05, Mar. 12, 2014).

19. The type of restraints used were "soft restraints." Specifically, Kerlix gauze was used for the restraints. *Id.* at 11:20:27- 11:20:52.

20. Nurse Paunte testified that Kerlix gauze is made for dressing wounds. *Id.* at 11:21:36.

21. While working at GMHA, Nurse Paunte has routinely asked for cloth restraints because it was better than gauze restraints, but more often than not GMH did not have any. *Id.* at 11:22:37-11:23:01.

22. Nurse Paunte testified that she checked on Mr. Bautista every thirty minutes to an hour. *Id.* at 11:11:46. However, Nurse Paunte's notes do not confirm that she or any other nurse went into Mr. Bautista's room to check on him in the exact above-stated time intervals. (Pl.'s Ex. 1 at 00026).

23. Nurse Paunte confirmed her deposition testimony that the nurses are supposed to chart each time they go into the patient's room. (Testimony of Nurse Paunte, Digital Recording at 11:17:28-11:17:36, Mar. 12, 2014).

24. Nurse Paunte stated that Mr. Bautista was fine and calm and then ten minutes later, she found Mr. Bautista standing at the foot of his bed with everything disconnected. Nurse Paunte attempted to bring Mr. Bautista back to bed but she was unsuccessful, which prompted her to call for assistance. *Id.* at 1:46:45-1:49:24. Mr. Bautista then broke the glass sliding door, went over the wall outside his fourth floor room, and jumped to his death.

25. Plaintiff's expert, Dr. Michael Kim ("Dr. Kim"), disagreed with Defendant's Expert, Dr. Tracy Gordy's ("Dr. Gordy") opinion, which stated that "[t]he description of the clinical picture in the emergency department did not indicate an agitated or psychotic individual." (Pl.'s Ex. 8 at 0002).

26. Rather, Dr. Kim testified that Mr. Bautista's medical history describes a psychotic patient. (Testimony of Dr. Kim, Digital Recording at 2:52:32, Mar. 12, 2014).

27. Dr. Kim testified that in his opinion, Mr. Bautista was a serious risk of suicide. *Id.* at 3:08:06.

28. Dr. Kim stated that in this case, the standard of care is to provide one-on-one observation by a qualified hospital staff member, which is basically the same as the plan set forth in Mr. Bautista's medical chart. *Id.* at 3:10:02-3:10:18.

29. Dr. Kim stated that GMH's plan compares to the Joint Commission's ("JCO") 2007 Patient Safety Goals for suicide risk assessment and treatment. *Id.* at 3:07:20.

30. Dr. Kim testified that the most important part of one-on-one care is that it is a deterrent to prevent the patient from acting on the spot and, in addition, to provide for safety. *Id.* at 3:10:23-3:10:42.

31. Dr. Kim testified that as a prophylactic measure, one-on-one observation would be better than restraints. *Id.* at 3:25:28-3:25:35.

32. Further, Dr. Kim stated that cloth is better for restraints instead of gauze because gauze is not a restraint and can tear easily. *Id.* at 3:26:33-3:26:50.

33. Dr. Kim acknowledged Mr. Bautista's February hospital records for the initial suicide attempt, wherein GMH recommended having a family member present at all times as a suicide precaution. *Id.* at 3:29:20-3:29:30.

34. Dr. Kim agreed that this February 2008 measure came closer to the JCO standard except that GMH wanted to use family members instead of trained staff members. *Id.* at 3:29:56.

35. Dr. Kim testified that GMH's 1992 (Def. Ex. E, Bates stamp 0001) policy regarding management of emotionally or mentally ill patients did not meet JCO standards. *Id.* at 3:31:57. Instead, the care plan compiled by Nurse Paunte that called for constant one-on-one observation for serious suicide risks met JCO standards. *Id.* at 3:32:59.

36. Dr. Kim stated within a reasonable degree of psychiatric certainty, that had Mr. Bautista been receiving one-on-one observation, he would not have been able to commit suicide. *Id.* at 3:34:18.

37. Dr. Kim explained that a person trained to respond to Mr. Bautista would have been a deterrent. That person would have been trained to put the patient's mind at ease, restrain the patient, and call for assistance, if needed. Although some nurses had

grabbed on to Mr. Bautista to stop him, there is a difference between being in a supine position and being already in an aggressive stance. With psychotic patients, if you are able to stop them at the initiation of whatever action they are going to undertake, it is an easier stop than if they had already built up momentum. In other words, seconds matter when it comes to psychotic patients. *Id.* at 3:35:14-3:37:38.

38. Dr. Gordy testified that the standard of care for a medical facility treating a patient that may have a secondary psychiatric issue is up to the hospital and, further, that the standard of care is to deal with the primary problem first. (Testimony of Dr. Gordy, Digital Recording at 10:50:43, Mar. 13, 2014).

39. Regarding a national standard of care, Dr. Gordy stated that there are separate standards for medical and mental facilities; clinical judgment is primary and the first thing to address; and that there are no other national standards. *Id.* at 10:51:52.

40. Dr. Gordy stated that at the time Mr. Bautista presented to the emergency department, the records to do not illustrate a psychotic individual. *Id.* at 10:46:30.

41. Dr. Gordy stated that he did not know if Mr. Bautista was trying to kill himself or if he was simply attempting to leave the room. *Id.* at 10:58:20.

42. Dr. Gordy testified that Mr. Bautista presented little to no risk of suicide. *Id.* at 11:25:10.

43. Dr. Gordy stated that if the Doctor thinks the patient is suicidal, a risk assessment is up to the Doctor's judgment. Further, if a person presents having attempted to cut their throat, they could be given a risk assessment for suicide after the Doctor repairs his throat. *Id.* at 11:30:23.

44. Dr. Gordy testified that Mr. Bautista did not need a risk assessment because Mr. Bautista's clinical condition at the time did not indicate the need for such risk assessment. *Id.* at 11:31:20.

45. Dr. Gordy agreed that assuming Nurse Paunte believed that Mr. Bautista was a serious suicide risk, then Nurse Paunte should have treated Mr. Bautista differently. *Id.* at 12:05:36.

46. However, Dr. Gordy stated that he reviewed Nurse Paunte's deposition transcripts, but that he did not recall that Nurse Paunte testified that Mr. Bautista was a level three suicide risk, the highest of suicide risks. *Id.* at 12:08:59.

47. Dr. Gordy agreed that if GMH had a reason to believe that Mr. Bautista had a propensity to violent suicide, then Kerlix gauze would be inappropriate as a suicide restraint. *Id.* at 2:30:36.

48. Over objection that he did not discuss foreseeability in his report prior to trial, Dr. Gordy pointed out that Mr. Bautista's volitional decision to slip his restraints and act in what appeared to be a deceitful way was not likely to be anticipated proactively. *Id.* at 11:46:43.

## CONCLUSIONS OF LAW

1. In order to prevail in a negligence action a plaintiff must prove: (1) "A duty, or obligation, recognized by law, requiring the person to conform to a certain standard of conduct, for the protection of others against unreasonable risks of harm"; (2) "A breach of that duty, or failure to conform to the required standard"; (3) "Proximate cause (a close and causal connection, also known as 'legal cause')"; and (4) "Actual loss or damage resulting to the interests of another." *Fenwick v. Watabe Guam, Inc.*, 2009 Guam 1 ¶ 12 (citing *Merchant v. Nanyo Realty, Inc.*, 1998 Guam 26 ¶ 14).

**Duty and Breach**

2. Every person has a duty to use the care of a reasonable person to avoid injuring another person. *See* 18 GCA § 90101; *Fenwick*, 2009 Guam 1 ¶ 12. Generally, a hospital may be liable for the suicide of a patient, where it is shown that the hospital failed to exercise reasonable care, based upon what it knew or should have known about the patient's mental condition, to protect the patient from self-inflicted harm. *See* Ronald A. Case, *Liability of Hospital, Other Than Mental Institution, for Suicide of Patient*, 60 A.L.R. 3d 880 (1974).

3. In this case, Dr. Kim and Dr. Gordy both testified to the applicable standard of care. Dr. Kim stated that the applicable standard of care in this case would have been to provide Mr. Bautista with one-on-one observation.

4. Dr. Gordy testified that for a medical facility treating a patient with a medical emergency and who may also have a secondary psychiatric issue, the standard of care is up to the individual hospital and to deal with the primary problem first. (Testimony of Dr. Gordy, Digital Recording at 10:50:44-10:51:39, Mar. 13, 2014).

5. Dr. Gordy also testified that JCO uses standards to measure hospitals for accreditation and that there is no standard for psychiatric care, directing how to take care of patients. *Id.* at 10:51:54-10:52:18.

6. Evidence of relevant, conflicting policies was presented including the care plan created by Nurse Paunte, GMH's policy number 6301-4 entitled "Emotionally or Mentally Ill Patients, Management Of", and GMH's policy number 6301-1 entitled "Restraints."

7. Nurse Paunte's care plan required one-to-one observation for a serious risk patient. GMH policy number 6310-4 provides, in relevant part, that for those patients whose unrestrained behavior threatens harm to themselves or others, GMH will: "[o]btain orders that specify restraints, medication, sedation, transfer to a security room, and notification of the patient's family. Restraints will be checked every thirty minutes and orders reviewed every 24 hours." (Def.'s Ex. E at 0001). GMH policy number 6301-1 states, in relevant part, that "[r]estraints require observation of the patient safety and behavior every one (1) hour and an assessment every two (2) hours." (Def.'s Ex. F at 0004).

8. Nurse Paunte assessed Mr. Bautista as a level three suicide risk which, under the care plan, required one-to-one observation. Thus, GMH owed a duty of reasonable care to Mr. Bautista in that it would provide one-to-one observation.

9. Nurse Paunte testified that she checked on Mr. Bautista every thirty minutes to an hour. (Testimony of Nurse Paunte, Digital Recording at 11:11:47, Mar. 12, 2014).

10. Nurse Paunte confirmed that formulating an individualized care plan for patients was the policy that existed in 2008. Further, Nurse Paunte stated that nurses are able to pick and choose what is best for the individual patient, which is what GMH wants its nurses to do. Moreover, Nurse Paunte testified that she chose to include in the care plan that if Mr. Bautista was a serious risk of suicide then he should be provided one-on-one observation. *Id.* at 2:14:21-2:16:51.

11. GMH breached its duty of care to Mr. Bautista by not following the standard of care that required one-on-one observation of a patient who was a serious suicide risk.

12. This conclusion is consistent with Dr. Kim's opinion, and also Dr. Gordy's testimony, which assumed that if Nurse Paunte believed that Mr. Bautista was a serious suicide risk, then Nurse Paunte should have treated Mr. Bautista differently. Because Dr. Gordy was unaware that Nurse Paunte did in fact believe that Mr. Bautista was a serious suicide risk, Dr. Gordy's testimony is not credible in that regard.

**Proximate Cause**

13. Proximate cause is, "at the very least, a causation-in-fact test, that is, the defendant's negligence must be a cause-in-fact of the plaintiff's claimed injuries." *Fenwick*, 2009 Guam 1 ¶ 13. "A defendant's conduct is not a cause-in-fact of an injury when the injury would not have occurred even if the conduct had not taken place." *Id.* (internal citations omitted). "When determining cause-in-fact, many courts traditionally apply the 'but for' test, that is 'to constitute proximate cause there must be such a natural, direct, and continuous sequence between the negligent act [or omission] and the [plaintiff's] injury that it can be reasonably said that but for the [negligent] act [or omission] the injury would not have occurred." *Id.*

14. Dr. Kim stated that there is a difference between being in a supine position and being already in an aggressive stance. With psychotic patients, if you are able to stop them at the initiation of whatever action they are going to undertake, it is an easier stop than if they had already built up momentum. Seconds matter when someone is

trying to kill himself. (Testimony of Dr. Kim, Digital Recording at 3:35:14-3:37:38).

15. Thus, one-on-one observation would have prevented Mr. Bautista, while in a supine position, from undertaking all that he did to assume an aggressive stance and eventually break through the door and leap to his death.

16. GMH's failure to provide one-on-one observation was the cause-in-fact of Mr. Bautista being able to free himself from substandard restraints, break through a glass door, and leap to his death. Mr. Bautista's actions and resulting death would not have resulted but for Defendant GMH's failure to perform its duty within the applicable standard of care.

17. A proximate cause analysis in a medical negligence case also warrants discussion of the issue of foreseeability. *See Rio Grande Regional Hospital Inc. v. Villareal*, 329 S.W.3d 594, 607 (Tex. App. 2010) ("Proximate cause is comprised of two components: (1) the cause-in-fact or 'substantial factor'; and (2) foreseeability"). "Foreseeability requires that a person of ordinary intelligence would have anticipated the danger caused by the negligent act or omission." *Id.* (internal citations omitted). "Foreseeability does not require that a person anticipate the precise manner in which an injury will occur once he has created a dangerous situation through his negligence." *Id.* (internal citations omitted). "Instead foreseeability requires only that the general danger, not the exact sequence of events that produced the harm, be foreseeable." *Id.* (internal citations omitted).

18. Dr. Gordy testified that it is not unusual that once an unsuccessful suicide attempt has been made, the person "quiets down" and does not present any new problems after the attempt has been addressed. Dr. Gordy stated that after the first suicide attempt, Mr. Bautista was calm and discharged to an out-patient setting. Dr. Gordy analogized that occurrence with the situation at issue, noting the similarities in behavior following an unsuccessful suicide attempt. Thus, Dr. Gordy stated that it was not foreseeable that Mr. Bautista would act out the way he did.

19. Plaintiffs' counsels objected and moved to strike Dr. Gordy's testimony relative to causation on the basis that such was not contained in his Guam Rules of Civil Procedure ("GRCP") Rule 26 report. GRCP Rule 26(a)(2) provides, in relevant part, "[t]he report shall contain a complete statement of all opinions to be expressed and the basis and reasons therefor . . . ." GRCP 26(a)(2). Dr. Gordy's report dealt primarily with the applicable standard of care, wherein he concluded that the GMH staff acted appropriately and did not significantly violate its policies, or more importantly compromise Mr. Bautista's care. As Dr. Gordy did not provide an opinion regarding causation, the Court may, in its discretion, exclude Dr. Gordy's testimony relative to causation.

20. However, even considering Dr. Gordy's testimony regarding causation, the Court still finds that Plaintiffs have established the element of proximate cause. As mentioned above, GMH's failure to provide one-on-one observation was the cause-in-fact of Mr. Bautista being able to free himself from substandard restraints, break through a glass door, and leap to his death. Furthermore, the Court concludes that the general danger of Mr. Bautista again attempting to commit suicide was not unforeseeable. In this case, Defendant not only knew of Mr. Bautista's present malady, which was the result of an attempted suicide, but it was also aware of Mr. Bautista's previous suicide attempt. Further, Nurse Paunte assessed Mr. Bautista as a serious risk for suicide, and Nurse Apalo also indicated, among other things, that Mr. Bautista was experiencing auditory hallucinations commanding self-harm.

21. Relevant case law demonstrates that hospitals have been held liable where patients exhibit suicidal tendencies known to the hospital staff, both before and after admission. *See United States v. Gray*, 199 F.2d 239 (10th Cir. 1952); *North Miami Gen. Hosp. v. Krakower*, 393 So.2d 57, 58 (Fla. Dist. Ct. App. 1981).

22. The Court finds that Plaintiffs have met their burden establishing Defendant GMHA's liability for the death of Mr. Bautista as a result of his committing suicide

while a patient at GMH. The matter of damages shall be determined at the second phase of this bifurcated trial.[2]

///

///

///

## CONCLUSION

Having considered the evidence adduced at trial, the Court finds that Defendant GMHA is liable to Plaintiffs for the death of Mr. Bautista as a result of his committing suicide while a patient at GMH. A schedule appearance is set for October 25, 2014 at 9:30 a.m..

**IT IS SO ORDERED** this 24th day of September, 2014.

HONORABLE VERNON P. PEREZ
Judge, Superior Court of Guam

SERVICE VIA COURT BOX

I acknowledge that a copy of the original hereto was placed in the court box of: _Fisher & Assoc. (Dewel) / Cunliffe (Cash) W. Gavras (Remy) (Roe)_

Date: 9/24 Time: 4:00p

Deputy Clerk, Superior Court of Guam

---

[2] If any of the foregoing findings of fact constitute conclusions of law, they are adopted as such; and if any of the foregoing conclusions of law constitute findings of fact, they are adopted as such.

*Bautista v. GMHA*
Civil Case No. CV1058-11
Findings of Fact & Conclusions of Law